UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 09-12204-RWZ

YODERNY PENA

v.

THOMAS DICKHAUT

MEMORANDUM OF DECISION

January 11, 2013

ZOBEL, D.J.

Petitioner Yoderny Pena was convicted of first-degree murder by a Massachusetts state court. His conviction was upheld on appeal by the Supreme Judicial Court of Massachusetts ("SJC") in a published opinion. Pena now seeks a writ of habeas corpus, claiming that errors at trial violated his constitutional rights.

**I.  Background**

On March 8, 2004, Pena killed his girlfriend by stabbing her fifty-one times. He turned himself in to the police five and a half months later.

Pena did not testify at his trial. His defense counsel acknowledged that he had killed the victim, but contended that Pena was mentally impaired at the time and incapable of the mental state required for first-degree murder. The only witness Pena called was a psychiatrist, Rebecca Brendel, who testified to Pena's long history of mental illness.

The trial judge's instructions gave the jury four options: first-degree murder based on deliberate premeditation, first-degree murder based on extreme atrocity or cruelty, second-degree murder, or not guilty. The jury returned a verdict of first-degree murder based on deliberate premeditation and on extreme atrocity or cruelty.

Pena's motion for a new trial was denied, and his conviction was affirmed on appeal. He now seeks relief through federal habeas.

## II.  Legal Standard

A federal court may only grant habeas relief on one of two grounds with respect to a claim adjudicated on the merits in state court. First, it may grant relief if the state court's decision was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). An "unreasonable application" must be more than merely incorrect; it must be "objectively unreasonable." Williams v. Taylor, 529 U.S. 362, 409 (2000). Second, the federal court may grant relief if the state court's decision was based on "an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2).[1]

Even if the state court's error is unreasonable, that error will not justify relief if it was harmless. To decide on collateral review if an asserted error was harmless, the

---

[1] The next subsection, 28 U.S.C. § 2254(e)(1), states that a factual determination by a state court "shall be presumed to be correct" and that petitioner "shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1). It remains unclear how § 2254(d)(2) and the arguably higher standard of § 2254(e)(1) interact. See Wood v. Allen, 130 S. Ct. 841, 848-49 & nn.1-2; Robidoux v. O'Brien, 643 F.3d 334, 338 n.3 (1st Cir. 2011). I need not reach that question here because in this case, as in Wood and Robidoux, petitioner's claims do not meet the lower threshold of § 2254(d)(2).

federal habeas court asks whether the error "had substantial and injurious effect or influence in determining the jury's verdict." Brecht v. Abrahamson, 507 U.S. 619, 623 (1993) (quoting Kotteakos v. United States, 328 U.S. 750, 776 (1946)).

## III.  Analysis

Pena's original habeas petition raised seven grounds for relief. In his brief supporting the petition, however, he maintains only two. See Docket # 28 at 1 ("The petition presents two issues for the court."). Pena has thus waived the other five grounds. See Herbert v. Dickhaut, Civil Action No. 06-10036-NG, 2011 WL 3021770 at *14 (D. Mass. July 21, 2011) (habeas claims raised in petition but not argued in brief are waived).[2] The waived arguments appear to lack merit in any case.

The two grounds for relief that Pena still asserts were considered and rejected by the SJC. See Commonwealth v. Pena, 913 N.E.2d 815 (Mass. 2009).[3] The state court's determination of these issues is entitled to deference under § 2254(d).

### A.  Ineffective Assistance of Counsel

As his first asserted ground for relief, Pena argues that his trial counsel was ineffective for failing to disclose certain medical records to the prosecution, and then failing to offer those records into evidence and question his expert witness Dr. Brendel further about those records.

### 1.  Dr. Brendel's Testimony

---

[2] I note that Pena was proceeding pro se when he filed his original petition, but was represented by counsel when he filed his supporting brief.

[3] Respondent does not contend that any procedural bars prevent reaching the merits of Pena's claims. It appears that the claims were properly exhausted and Pena's petition was timely filed.

At trial, Dr. Brendel testified to Pena's mental illness based on her review of Pena's medical records and her interviews with Pena and his sister. As discussed in the SJC's opinion:

> Dr. Brendel reviewed Pena's medical records reaching back to 1996, when Pena first sought psychiatric treatment in the Dominican Republic, as well as records from the Boston Medical Center, Holy Family Hospital, and Bridgewater State Hospital, dating after 2002 when Pena moved to the United States. Dr. Brendel also reviewed reports prepared by a Dr. Presskreischer, a psychologist retained in this case to gather Pena's mental health history, and by the Commonwealth's expert, a Dr. Fife. Finally, Dr. Brendel spoke to Pena's sister and interviewed Pena while he was incarcerated.

Pena, 913 N.E.2d at 821 (footnote omitted). The SJC also noted that neither Dr. Presskreischer nor Dr. Fife testified at trial. Dr. Brendel was the only psychiatrist who appeared as a witness.

Dr. Brendel explained that Pena had a history of severe mental illness:

> According to Dr. Brendel, Pena's history of mental illness began when he was eighteen years old, and included changes in his mood; periods of severe and profound depression and agitation; a clearly documented history of psychotic symptoms, affecting his ability to think clearly and appreciate reality; paranoia, suicidal thoughts, and fears that others might harm him; and a documented history of long-term substance abuse. The onset of Pena's psychiatric symptoms coincided with the beginning of his drug abuse.

Id. Pena was diagnosed with bipolar disorder with psychotic features in 1996; his doctors in the Dominican Republic indicated that he thought he was being watched, pursued, and persecuted. In June 1999, Pena was treated in the Dominican Republic with electroshock therapy and antipsychotic medications, which his doctor there continued to prescribe for him until December 2003 (after he had moved to the United States). In the spring of 2003, Pena was seen by a psychiatrist at the Boston Medical Center, who diagnosed him with recurrent major depression and prescribed

4

medications. On March 3, 2004, five days before the murder, Pena, at his sister's urging, went to see a social worker at Boston Medical Center. The social worker could not fully evaluate Pena, because no interpreter was available, but "noted that Pena was suffering from depressive symptoms and had poor memory and concentration." Id. at 822.

Dr. Brendel testified that Pena told her in their interview that he was severely depressed and acutely suicidal on the day of the murder; that he had not slept for three nights; and that he had been using cocaine, marijuana, and alcohol. He told her that he had intended to kill himself, and showed her scars he had reportedly inflicted on himself; but he could not explain why he had killed his girlfriend. He claimed that he had very little memory of what had occurred.

On the basis of the information available, Dr. Brendel concluded that "Pena suffered from a chronic and severe mental illness on the day of the killing; that Pena was suffering from depression and was preoccupied with suicidal thoughts; and that he had difficulty remembering what happened because of a combination of his mental illness and substance abuse." Id. She expressed "serious doubt" whether Pena could form the intent required for first-degree murder on the day he killed his girlfriend. Id.

Near the end of her testimony, Dr. Brendel testified about Pena's treatment for mental illness after the killing. Five months after the murder and shortly before Pena turned himself in to the police, he was hospitalized at Holy Family Hospital for seven days. Once in custody, Pena was then evaluated at Bridgewater State Hospital and found competent to stand trial. The report from Bridgewater State Hospital "indicated a

high suspicion that Pena was feigning memory problems." Id. at 822-23.

### 2. Medical Records

Pena claims ineffective assistance of counsel in connection with Dr. Brendel's testimony about Pena's hospitalization at Holy Family Hospital. On direct examination, Dr. Brendel testified that she had reviewed records from that hospitalization, and explained that they were useful as a second evaluation that took place shortly before the Bridgewater State Hospital evaluation. Pena's counsel then asked if there was any relevant information in the Holy Family Hospital records, and Dr. Brendel replied:

> Well, in those records there was some concern about Mr. Pena's difficulty with memory and being able to give an accurate history. The discharge diagnosis included a diagnosis of psychosis not otherwise specified. So, the physicians in the hospital did observe him at some time during the hospitalization to be suffering from psychotic symptoms.

Id. at 830. At that point, the prosecutor objected. He stated at sidebar that the Holy Family Hospital records had never been provided to his expert or the trial court, and asked to see the records or else to have Dr. Brendel's last answer stricken. The following colloquy took place:

> THE COURT: What do you say about the discovery of these records?
>
> [Pena's counsel]: I believe that I gave all the records that I had. If they weren't provided, it was inadvertently that they weren't provided. And I don't have any more questions about these records.
>
> THE COURT: Okay. I'm going to exclude it.
>
> [Pena's counsel]: Okay.

Docket # 24 ("Trial Transcript"), vol. IV at 48. The trial judge then told the jury to disregard Dr. Brendel's last answer.

Pena argues that his counsel was ineffective for failing to produce the Holy

6

Family Hospital records to the prosecution, and then for failing to offer them into evidence at trial and cross-examine Dr. Brendel further about them. According to Pena, his hospitalization at Holy Family Hospital was powerful evidence of his mental illness because it provided an objective third-party evaluation of his mental state, rebutting the prosecution's argument that Dr. Brendel was not credible. Pena also notes that the Holy Family Hospital records reflect that he was referred to the hospital after he had gone to a police station for help, complaining that he heard voices telling him to hurt himself. He argues that his voluntary appearance at a police station seeking psychiatric help, five months after he had killed his girlfriend, showed dramatically that he was indeed mentally impaired.

The SJC rejected Pena's claim. It found that the Holy Family Hospital records were merely cumulative of other testimony Dr. Brendel had already given. Furthermore, it found that Pena's counsel had made a strategic decision not to offer the records in evidence, and that the decision was not manifestly unreasonable given certain negative statements also found in the records.

Pena has not shown an error justifying relief. To prove his counsel's ineffective assistance violated the Sixth Amendment, Pena must point to a specific error that fell below the standard of reasonable competence and that raises a reasonable probability that the verdict would have been different. Strickland v. Washington, 466 U.S. 668, 687-98 (1984). First, Pena argues that his counsel's failure to produce the records in discovery fell below the standard of reasonable competence. Because that failure was inadvertent, Pena argues, it was not a strategic decision and so deserves less

deference. Cf. Wiggins v. Smith, 532 U.S. 510, 526 (2003) (finding counsel's conduct unreasonable where it resulted from "inattention, not strategic judgment"). The discovery failure led directly to the striking of Dr. Brendel's answer about the contents of the records.

The SJC did not specifically address whether defense counsel's failure to produce the records in discovery was incompetent. See Pena, 913 N.E.2d at 831 n.18. However, it determined that the Holy Family Hospital records (and by implication, Dr. Brendel's answer summarizing them) were cumulative of other evidence already presented. Given the extensive testimony provided by Dr. Brendel about Pena's long history of medical illness, and the other medical records she relied on in her diagnosis, the SJC's determination was not objectively unreasonable. Because the evidence excluded was cumulative, Pena cannot show a reasonable probability that the verdict would have been different if it had been introduced. He therefore cannot show a Sixth Amendment violation. Strickland, 466 U.S. at 694.

Pena also argues that as well as failing to produce the records in discovery, his counsel erred by failing to offer the records as evidence at trial and cross-examine Dr. Brendel further about them. The SJC found, however, that defense counsel made a strategic decision not to offer the records at trial or pursue that line of questioning.[4] That factual determination by the SJC is not unreasonable, given the statement by

---

[4] Pena gives no reason to believe that his counsel's failure to produce the records in discovery would have prevented admitting them at trial. Indeed, the prosecutor apparently was not completely unwilling to allow them in. See Trial Transcript, vol. IV at 48 ("I'd like to get a look at them, at the very least.") In any case, there is no evidence that defense counsel's strategic decision not to offer the records at trial was caused by the prior failure to produce them in discovery.

Pena's counsel at sidebar that she had no further questions about the records, and also given the other negative information contained in those records. (That negative information including the suspicion that Pena was "being purposely avoidant and vague" in his medical interview, Pena, 913 N.E.2d at 832, potentially because he had entered the United States illegally.) Nor was it an unreasonable application of clearly established federal law for the SJC to conclude that defense counsel's strategic decision to avoid this topic not a Sixth Amendment violation. Id.; see Strickland, 466 U.S. at 689-90. Finally, the SJC reasonably held that Pena suffered no prejudice from his counsel's decision because the records were cumulative. Pena, 913 N.E.2d at 831-32. Because it was not objectively unreasonable for the SJC to decide that Pena suffered no Sixth Amendment violation, he is not entitled to habeas relief on this ground.

### B. Self-Incrimination

Pena next seeks relief for an asserted violation of his Fifth Amendment rights under Griffin v. California, 380 U.S. 609 (1965). In Griffin, the Supreme Court held that the Fifth Amendment's protection against self-incrimination prohibits a prosecutor from commenting on a defendant's decision not to testify. Id. at 615. The Court elaborated on that holding in United States v. Robinson, 485 U.S. 25 (1988), clarifying that "prosecutorial comment must be examined in context," and that the Fifth Amendment is not violated when "the prosecutor's reference to the defendant's opportunity to testify is a fair response to a claim made by defendant or his counsel." Id. at 32-33. The prosecutor's remarks are judged by whether "the jury would naturally and necessarily

take [them] to be a comment on the failure of the accused to testify." United States v. Rodriquez-Velez, 597 F.3d 32, 44 (1st Cir. 2010) (quoting United States v. Glantz, 810 F.2d 316, 322 (1st Cir. 1987)).

Pena's counsel contended in his closing that the prosecution had not presented any evidence to show a motive behind the murder, and so he argued that the murder could only be an irrational act produced by Pena's mental impairment. In what the SJC described as an "apparent response" to that argument, the prosecutor stated in his closing:

> "[W]hat have we learned that says mental illness or mental impairment had anything to do with this? Well, we don't know why. We don't [know] why he did it . . . ?
> Two people are close to each other, they have an argument and one of them ends up dead. Well, one of them will never be able to tell us why it happened, will she? [The victim], obviously, can never tell us. The defendant is the only one who knows why he did it. He's the only one who knows why he got so enraged that he had to kill . . ."

Pena, 913 N.E.2d at 829. At that point, defense counsel objected and the objection was sustained. At the end of the prosecutor's argument, the judge instructed the jury that the defendant had an absolute right not to testify, that it was improper for the prosecutor to comment on that right, and that they were to disregard the portion of the prosecutor's closing that stated the defendant was the only one who knew. The judge then instructed the jury again during the final charge that Pena had an absolute right not to testify and that the jury could not draw any adverse influence from his exercise of that right.

On appeal, the SJC held that the prosecutor's comments were not improper. Though it recognized that the question was "a close one," it was "persuaded that the

prosecutor did not intend his comment to be understood as a comment on Pena's failure to testify, and that it is not likely that the jury would have considered it as such." Id. It saw the prosecutor's remarks "more as a comment on the absence of evidence of motive as opposed to Pena's failure to take the stand." Id. at 829 n.16.

Given the context-sensitive nature of the Robinson test, the SJC was surely correct to conclude that the question is a close one. If I were deciding the issue in the first instance, I might reach a different conclusion than the SJC did. But reviewing the SJC's decision with the deference mandated by § 2254(d)(1), I cannot say that the SJC's conclusion that the prosecutor did not violate Pena's Fifth Amendment rights was contrary to, or an unreasonable application of, the Supreme Court's holding in Robinson. See Morgan v. Dickhaut, 677 F.3d 39, 46 (1st Cir. 2012) (for a state court decision to be unreasonable, "some increment of incorrectness beyond error is required" (quoting O'Laughlin v. O'Brien, 568 F.3d 287, 299 (1st Cir. 2009)).

In any case, even if the prosecutor's comments did violate Pena's Fifth Amendment right against self-incrimination, the error was harmless. The reference to Pena's silence was brief and immediately interrupted by objection; it did not form a major theme of the prosecutor's argument. Cf. Chapman v. California, 386 U.S. 18, 19 (1967) (error not harmless beyond a reasonable doubt where prosecutor "fill[ed] his argument to the jury from beginning to end with numerous references to their silence and inferences of their guilt resulting therefrom"). The judge issued a curative instruction at the end of the prosecutor's argument, and instructed the jury on the same point in the final charge. In the SJC's opinion, "[t]he judge's prompt and thorough

instructions here 'were sufficiently clear and complete to negate any possible prejudice to the defendant." (Pena, 913 N.E.2d at 830 (quoting Commonwealth v. Phoenix, 567 N.E.2d 193, 204 (Mass. 1991)). Pena's argument that the instruction was ineffective because it was issued only at the end of the prosecutor's closing argument, rather than immediately after the asserted error, is unconvincing. Under these circumstances, Pena has failed to show that the error had a "substantial and injurious effect or influence" on the verdict against him. See Brecht, 507 U.S. at 623. He therefore is not entitled to habeas relief.[5]

## IV.   Conclusion

Pena's petition for a writ of habeas corpus (Docket # 1) is DENIED. Respondent's motion to dismiss the petition (Docket # 14) is DENIED as moot. Judgment may be entered accordingly.

|  |  |
|---|---|
| January 11, 2013 | /s/Rya W. Zobel |
| DATE | RYA W. ZOBEL |
|  | UNITED STATES DISTRICT JUDGE |

---

[5] The Brecht test for harmless error "obviously subsumes" the standard for deferential review under § 2254(d) of the state court's harmless-error analysis, and so I need not apply the latter test independently. Fry v. Pliler, 551 U.S. 112, 120 (2007).